Will the clerk please call the next case? 2230114 WC City of Aurora Appellant by Stephen Jacobson v. Illinois Workers' Compensation Comm'n John Gibson-Appley v. Adam Burnett Mr. Jacobson, you may proceed. Thank you and good afternoon. May it please the court. As just mentioned, I represent the appeal involves two rules which shield employers from liability in our workers' compensation system. The first issue that I want to talk about is that liability cannot be grounded in speculation and conjecture, particularly where the issue involves causation between the employment and the condition of oping. And then the second issue I want to talk about is the rule that liability does not attach where a pre-existing condition is so far deteriorated that any exertion is an overexertion. Addressing the first issue on causation, the commission in this case engaged in improper speculation when it found causation between the employment and condition of oping. What did Dr. Karahelios have to say? Dr. Karahelios talked about, he did apply that there was an aggravation or an exacerbation. However, he did not fully possess all of the medical records when he testified on direct examination. And on cross-examination, after he saw everything about the pre-existing condition, and then when we talked about the injection therapy, he conceded that it would be impossible for anyone to predict what the outcome from those injections would have been. I'm only concerned with his opinion where he opined that the accident aggravated the pre-existing condition. Well, what's wrong with that opinion? You say it because he didn't have all of his medical records? Well, the problem is that because of the fact that he, that Gibson had a long-standing condition that waxed and waned between 2002 and 2017, then had a softball injury in June of 2017 that turned an intermittent problem into a constant and progressing problem. It's our contention and that the evidence showed that he was already on the road to needing surgery. And the question as to whether or not he would have avoided that surgery had the work incident never occurred is pure speculation. The Clayman's theory of causation in this case essentially boiled down to the theory that the work incident was a re-injury, I'm sorry, a re-aggravation superimposed on a earlier aggravation from three months earlier that necessitated the surgery. But the implication from that theory of causation is that he never would have had a 2018 revision surgery had this work incident never took place. And I respectfully submit that it's speculative. What did Dr. Daly inquire about the disc herniation? Well, when he was asked on direct examination about one of the MRI films, he noted that there seemed to be a change in the L5 S1 level, but that was not the level that was operated on. He agreed that the right-sided pathology at the L4 L5 level was unchanged. And the only new pathology he saw was at the L5 S1 level, but clinically that was a transient issue because the left-sided symptoms went away and they went away by the time or while he was under care with Dr. Daly. And by the time he gets to Dr. Karahelios, it's only the right-sided pathology at the L4 L5 level. That's the only surgery that was performed by Dr. Karahelios. That was the same revision surgery that was recommended in 2009. So we know that the work incident never altered the treatment plan, never altered the surgical plan, never altered the road that he was on for surgery. And because three months earlier, he had this dramatic change for the worse when playing softball. And because it went from an intermittent problem to a constant problem, it's speculative to say that he would have never had the surgery had the work incident never occurred. They're both equally plausible. He may have had a return to his baseline condition after the injection therapy, and he may not have returned to his baseline condition after the injection therapy. And Dr. Karahelios said that it's impossible to predict how this would have played itself out. And so we have to engage- My question was, did Daly, or Daly, whatever his name is, find that the work-related injury caused two disc herniations, one on the right at L4, L5, and the left at L5, S1? No. This protrusion that was at L4, L5, predated not only the work accident, but it also predated the softball injury. So he didn't opine that, what I just read. No. It's not his opinion. No. In fact, when I questioned him on cross-examination about the MRI that he himself ordered, which was performed in 2018, he agreed with that radiologist's findings, and he agreed that the L4, L5 herniation was always there. It was the same thing, it was predated. So what we're talking about is did it change or alter the road he was on? And after my cross-examination, I don't think Dr. Karel Halios really corrected himself or changed anything on redirect. On initial direct, he did say that there was an exacerbation that culminated in the need for surgery, but then he qualified his statement, and I quote, based on the timeline we have here. And then on cross-examination, I presented to him all of the pre-accident records and all the prior MRIs, and he agreed that the injection therapy, it would be impossible to predict what the outcome would have been. He said that it's a mixed bag. Those were his words. For some patients, they get resolution. For some patients, those injections give partial resolution. And for some patients, they give no resolution. And if you get partial resolution, he agreed that the benefits can fade over time. So since we can't predict what the outcome of the injections would have been, we cannot predict whether or not he would have needed the back surgery if we take out the work incident from this equation. And so for that reason, it's speculation to say that the employment incident on September 5 played any role or contributing factor in the necessity for surgery. And so that's why I think the dissenting opinion by Commissioner Dorris got it right, where she articulated the concept of the proverbial straw that broke the camel's back. And she said that based on the before and after, at the time of the softball injury, it was a softball injury that was the proverbial straw that broke the camel's back. And she agreed with our position that you cannot causally relate the surgery he had in 2018 with what happened at work. And so it's my request that this court reverse the commission's decision on that basis and adopt the dissent rationale for that case. The other argument that I made was this about the rule of limitation, which holds that where a pre-existing condition is so far deteriorated that any exertion would be an overexertion, then compensation must be denied. The commission did not apply that rule at all. In fact, the commission never even made a factual determination on that issue. The commission, in my judgment, erred because they mistakenly believed that the Supreme Court's decision in Macalester replaced that longstanding rule of law. And as I discussed in my brief, the Supreme Court in Macalester only articulated the correct analysis that needs to be undertaken to identify what risk is involved in any given case. That being whether we are dealing with a employment risk, a personal risk, or a neutral risk. Excuse me for one second. If a work-related accident aggravates a pre-existing injury, then the worker is entitled to compensation. CISPRO stands for the position that the accident need not be the only cause. It need not be the primary cause. It only needs to be a cause. And in this case, there's evidence in the record introduced by the petitioner that the work-related event aggravated a pre-existing injury. I would agree with everything you said except for the question of whether or not this limitation on liability has been established or not. But CISPRO says that's a factual question. That's for the commission to decide. And that is correct. And that was the precise issue that this court dealt with in the, I think it was the twice over clean case. And in that case, there was conflicting medical opinion evidence for the commission to make a decision. In this case, not only did the commission decline to make a factual determination, but the medical opinions were in agreement. There was no conflict. Both Dr. Karahelios and Dr. Wellington-Hsu were in full agreement regarding the severity of Gibson's pre-existing condition. And I just want to quote what Karahelios said on cross-examination. Based on the prior medical records, Dr. Karahelios testified that Gibson's condition was such that his lumbar spine was, and I quote, pretty fragile and it would not take much to reinjure his back. And we know that by 2011, Gibson's condition was so weakened that bending over and standing up in the shower at his home was enough to cause pain. Going to an MRI center to have an MRI taken and then having a pain episode while getting off the table was enough. And then bending over to pick up a paper target for sniper practice was enough to be a triggering event. And then we had the softball injury where he's merely turning his torso, his upper body to throw the ball. And that did him in. That was the bomb that went off in June of 2017. And so because his lumbar spine condition was as fragile as it was, to use Dr. Karahelios' own words, that meets the standard for the limitation on liability, which is that when a condition is so advanced that any exertion is an overexertion, then compensation must be denied. And I'll just finish off really quickly by saying that the is that if the only connection between the employment and the condition is that the injury occurring at work was mere happenstance, then it's not a compensable claim. So let me just interject. First of all, I commend you on your brief. This case has a record of nearly 6,000 pages. And the medical was quite extensive. And I thought you did a really nice job on the brief. But how do we get around the fact that the softball injury occurred in June sometime of 2017? And he continued working in full capacity until the accident, the incident on September 5th of that year with where he struggled with the assailant or with the mentally ill person. So I guess my point is, how do we know that the softball injury, as you said, sent him over the edge or straw that broke the camel's back when he continued working for that several months after that until that other incident? Yeah, I have three reasons for that, three things to point out. Number one, he did not work in his full capacity for the entire time. He took two vacations or paid time off, if you will. And when an officer decides to take time off for work, they can elect whether they want to call it sick time, paid time off, vacation time. The bottom line is he took time off during those three months. But that was his time to take off. He wasn't requesting a medical leave or he wasn't put on desk duties or anything of that nature, correct? That's correct. He just decided to take off work completely. Okay. And the second thing is that when you look at the medical records, it was only after the softball injury that his doctor started documenting a history of constant pain. And when you look at Dr. Houlahan and Dr. Usman and Dr. Augusty, they all say that everything had been manageable. Those were their and after the softball injury, it stopped being manageable. Yes, it was going to work, but it was also getting injection therapy. And as we pointed out, injections do help. Dr. Augusty said they're designed to help alleviate your pain. But Dr. Augusty added that it doesn't fix the problem. And so the question here is, how long would the benefits have lasted? Would they have lasted a few months, less than a few months, more than a few months? They fade over time. And as Dr. Carahelio said, it varies from patient to patient. It's impossible to predict. And that's why causation was pure speculation. And I think that Commissioner Doris was persuaded by the dramatic change or shift in the before and after from the softball injury to conclude that we cannot say with a reasonable degree of certainty or the recurrence of the evidence that the work incident was the cause for this and needing a surgery. Your time is up, Mr. Jacobson. And now you will have time and reply. Are there any further questions from the court? No. Okay. Thank you. Mr. Burnett, you may respond. May it please the court, counsel. My name is Adam Burnett. I'm here representing the FLE, Mr. John Gibson. In my opinion, the question for this court to decide is essentially whether there is an adequate basis for the commission to find that the work accident aggravated the preexisting condition and caused Mr. Gibson's disability. Gibson had a lumbar surgery in 2002. And 15 years of medical evidence after that surgery documented approximately nine cases of back pain exacerbations. Appellant attempts to paint a picture of a worker who constantly suffered from debilitating back pain and even refers to him as a ticking time bomb. In reality, Gibson was working for the appellant since 1997 as a police officer. He worked on patrol. He was a member of the city SWAT team from 2000 up until 2013. This role required semi-annual physical assessments. He then injured his back while restraining a 200-pound individual on September 5, 2017. This individual repeatedly lunged for to the work injury, does not document any changes in Gibson's preexisting lumbar condition. And then Gibson's four treating physicians all opine to a change that both in Gibson's symptoms, but also to the objective MRI evidence following the work injury. Well, do you agree, Mr. Burnett, with the characterization, Mr. Jacobson, that his condition was a waxing and waning? And I think he was trying to emphasize that the time of the softball injury, it was not waning, but it was waxing. And that's what accelerated a chronic condition. So somewhat prior to the softball injury, it was fairly minor according to Gibson's testimony and the medical records. He would several times a year suffer from back spasms that would typically resolve within several days. The June 2017 softball injury was worse than the prior minor exacerbations that he suffered. That is reflected in the medical evidence because he actually did get some treatment for that. He didn't miss work besides one day, which was after he received the second injection for the June 2017 softball injury. Well, let's go back to really the theory of the case, I think, is that we all know that aggravation or preexisting condition is compensable, correct? Yes. Okay. But his theory is that, yes, I got a preexisting condition here, but the aggravation was the aggravation of the softball incident that basically turned this into a chronic condition. Is there any medical support for his position? There is medical support for Appellant's position, but the commission rejected those opinions. The arbitrator and the commission and the circuit court all found more credible Gibson's treating physicians who all four had opinions that his problems were, some of the doctor's opinions were that his symptoms were decreasing and the conservative treatment that Gibson was receiving prior to the work accident were helping and providing relief. Um, so they all then test, not testify, but opine that his condition noticeably got worse. His symptoms changed and his pain levels increased following the September 5th, 2017 work injury. Um, the Dr. Gailey, Dr. Kerry Helios testify, sorry, Dr. Gailey did not testify, but in the objective medical evidence on the MRI that shows a increase in the herniation and an increase in the symptoms. And Dr. Kerry Helios essentially testified to the same thing during this deposition. Um, the arbitrator did find them more credible. Um, the issue that Dr. Kerry Helios did have access to decades of Mr. Gibson's medical records prior to the deposition. He didn't find that convincing or hurting Dr. Kerry Helios' testimony because once he was cross-examined with that information, his opinion stayed the same, that this work accident increased the severity of Gibson's symptoms and caused a need for surgery. And that surgery is what eventually caused a decrease in Gibson's symptoms. Um, so essentially there were four doctors who gave opinions that the work accident aggravated and accelerated the preexisting condition, which required additional medical treatment. The additional factor that the arbitrator, um, put emphasis on was that, um, Gibson was working full duty during this time as a police officer in the interim between the softball injury and the work accident. Um, Gibson never went back to work as a police officer in full duty capacity after September 5th, 2017. So just the temporal aspect of that is a significant factor for the commission finding that, um, this work accident was the inciting incident that required the surgery and Gibson's disability. Regarding the, any exertion is a overexertion argument that, um, FLM makes. Um, this case is in my opinion, very factually similar to CISPRO, um, where it is ultimately a employment risk. The employment risk in this case, um, and that Gibson was performing his duties as a police officer in restraining an individual, um, suspect or subject. Um, he wasn't just standing up from a chair, turning in a chair. It wasn't a common everyday movement that caused Gibson's injury. Um, he was actually working as a police officer in physical capacity, restraining somebody. So this is not something that I have to ever do. It's not something most people have to do in their common everyday lives. Um, and so that's, that's why that was a significant factor for the arbitrator as well, because it was clearly something that Gibson has to do in his work that actually caused his injury. The circuit court judge's opinion, um, made note of that as well and acknowledged that there are cases where there are common daily activities that can be denied on this basis that any exertion is an overexertion and somebody turning in a chair does not entitle them to workers' compensation benefits. But due to, um, the physical aspect of Gibson's injury, um, wrestling with a, at least a 200-pound suspect for three to five minutes, um, and he explains it in more detail in his direct testimony, um, but it was a very physical altercation where he was attempting to restrain an individual. So it was much more activity than any of these prior incidents that, um, caused any flare-ups of back pain or back spasms. And this incident also increased the symptoms to the point where he was having, um, left leg symptoms, left foot symptoms, and increased sciatica both to the right and then new sciatica to the left, which is documented in the medical records. Um, so, um, in summary, CISPRO concludes if there is an adequate basis for finding that an occupational activity aggravated or accelerated a preexisting condition and caused the disability, then the commission's award of compensation must be confirmed. Um, again, petitioners for treating physicians stated that it did. Um, the arbitrator weighed the credibility of the numerous experts and Gibson. The arbitrator found the September 5th injury aggravated petitioner's condition. Um, the commission affirmed as did the circuit court. Accordingly, FLE respectfully requests this court to affirm the commission's decision. I mean, unless there are any questions for me, I will yield the remaining time. Any questions on the bench? No. Thank you, Mr. Burnett. Thank you, Mr. Jacobson. You may reply. Yes. Uh, thank you. I'll be brief. Um, just, I want to for a moment return to the limitation on liability rule. Um, where if a condition is so far advanced that an exertion is an over exertion, um, if the, um, we don't hold employers, um, liable when they've done nothing more than furnish the geographical location, um, or the time for the injury. Um, and so the test is a straightforward legal standard, um, was the preexisting condition so far advanced that any exertion was an over exertion. There's no second prong to the test. So we don't have a further analytical step after that's been established and say, well, how benign or how minor or how mundane was the mechanism of injury? The, the, the limitation focuses on the severity of the preexisting condition because we are not a positional risk state, um, in here, uh, in Illinois. Um, and we don't hold employers liable for something that happens by mere happenstance. It's gotta be more than coincidence that someone's at their place of employment. Um, and regarding this particular, uh, mechanism injury, uh, restraining someone is not a major or significant, um, event. He was not by himself. He was with two other officers and one officer was on one arm and Gibson was on the other arm and they each grabbed his arm when this, I think it was autistic when the subject named David was reaching into a kitchen drawer. Um, and I disagree with the characterization that there was wrestling involved because, um, on direct, um, officer Gibson said that he was wrestling and took him to the ground. But then when he was confronted with a prior inconsistent statement or a recorded interview, he retracted that and admitted that we didn't take him to the ground. He thought he did, but he forgot. So, so you're saying, uh, but he was holding his arm, correct? Correct. Okay. In a restraining manner. Okay. In a galley kitchen with not a lot of room to move. If you can visualize three people in between a kitchen shelves on one side and kitchen shelves on the other side, um, it's described as a galley kitchen. Um, and, uh, this subject named David reached into a drawer and both officers grabbed his arm and then they pulled him back. He went again for the kitchen drawer and they pulled him back again. Uh, officer Gibson testified, they never brought him to the ground after he was confronted with, uh, his previous, but you're saying, but I understand all that, but you're saying that the actual movement of tensing your own arm to restrain someone is, is insufficient. No, what I'm suggesting is that it's, not, um, it's, it's somewhat benign. It's somewhat minor. Um, but I don't want to get distracted from what the legal test requires, which focuses on the severity of the preexisting condition. If so far, uh, so what is there in the record that, that supports your view that this, this restraining action, and I'm not talking taking to the ground or anything like that, or the term wrestling, but this restraining action, uh, was sufficient in and of itself, uh, to, to create the condition. Well, Dr. Terry Helios testified and he used the word superficial. He said that the mechanism of injury was quite superficial based on Okay. And so that's why I'm saying that, uh, it gets manifest with the evidence because both doctors agree this is a minor occurrence based on the history that Gibson gave them. Thank you. Is that was, I'm sorry, do I have more time or? Yeah, well, you're, you're on the, you're, you're going through the intersection on a yellow line right now. So I'll just finish by saying that on the causation, um, theory, the question is, would he have needed his surgery even absent the work accident? And the theory of causation put forth by the claimant, Mr. Gibson, is that he would not have needed the surgery without the accident. And I think that's pure speculation and conjecture because they're still treating. He hadn't finished. He hadn't returned back to baseline. Uh, the injections only provided partial relief. Dr. Augusty documented 50%. Thank you. Okay. Thank you, Mr. Jacobson. Thank you. Council both for your arguments in this matter this afternoon.